### WHITE v. COMMERCIAL AND FARMERS' BANK.

TRUST—BANK—DRAFTS—LIEN.—A party forwarding a draft to a bank (no showing as to how indorsed, whether for collection or generally), which bank collects and puts among its general assets, upon insolvency of bank and appointment of receiver, in order to have specific lien on assets of bank for proceeds of such draft must *substantially* identify his funds among those of the bank, and show that they went into the hands of the receiver.

Before KLUGH, J., York.    Affirmed.

Action by A. H. White against Commercial and Farmers' Bank of Rock Hill, S. C., *et al.,* and John Rugheimer, claimant. From order refusing claimant, Rugheimer, a special lien on assets of bank for amount of draft collected by it, he appeals.

*Messrs. J. Lamb Perry* and *Geo. W. S. Hart,* for appellant.    The latter cites: 59 Am. S. R., 573; 37 Am. S. R., 265; 46 Am. R., 91; 26 S. C., 386; 56 S. C., 213; 53 Am. R., 574; 20 *Id.,* 443, 263; L. R., 13 Ch. Div., 696; 21 Am. S. R., 611; 76 Ind., 567; 1 Wall., 173; 42 Neb., 900; 36 Neb., 32, 333; 96 N. Y., 36; 100 N. Y., 34; 83 Mo., 213; 88 Mo., 520; 36 Minn., 78; 80 Ia., 500; 81 Ia., 495; 69 Tex.,

495; 49 N. J. Eq., 425; 49 Ohio St., 403; 62 Fed. R., 960; 36 F. R., 61; 35 Pac. R., 471; 104 U. S., 66; 133 U. S., 696; 146 U. S., 510; 3 S. C., 160; 31 S. C., 359; 20 Am. St. R., 440, 267; 37 Am. St. R., 267.

*Messrs. Witherspoon & Spencers,* contra, cite: 3 M. & S., 562; 5 Ves., 169; 1 Atk., 232, 172; 3 S. C., 160.

April 1, 1901. The opinion of the Court was delivered by

MR. CHIEF JUSTICE McIVER. The statement made in the "Case" is as follows: "The above entitled action was commenced in the Court of Common Pleas for York County on the 3d day of February, 1900. The purpose was to have the Commercial and Farmers' Bank, an insolvent corporation, which had been organized under the laws of this State, put into the hands of a receiver; a temporary receiver was appointed on the 3d day of February, 1900 (afterwards made permanent), and all persons holding claims against the insolvent corporation were called in to establish their demands in this action. Under the call, John Rugheimer established his claim. Amount of claim $406. In establishing his claim, John Rugheimer claimed to be a creditor to the extent of $150, but asserted that he was a *cestui que trust* as to the remaining $256. His claim arose as follows: He sent (through the Exchange Banking and Trust Co.) four drafts to the Commercial and Farmers' Bank of Rock Hill, S. C., for collection and remittance. Three of the drafts, aggregating $256, were collected by said bank in money or its equivalent, and the fourth draft (for $150) was collected by a check on the Commercial and Farmers' Bank itself. The Commercial and Farmers' Bank did not remit for the collections, all of which were made before the appointment of a receiver for the bank. The draft for $150 and another draft for $125 were sent to the Commercial and Farmers' Bank on the 4th day of January, 1900, and two other drafts ($38 and $93) on the 20th day of January,

1900. The claimant contended that as to the $256 which went to augment the assets of the bank, he was not a creditor simply, but had a lien upon all the assets of the bank, giving to him priority over other claimants who were creditors simply. The referee sustained the contention of the said John Rugheimer; but upon exceptions to his report, the Circuit Judge, Hon. J. C. Klugh, held that the law was otherwise—that Jno. Rugheimer was a creditor simply for all of his claim. The hearing was had upon the referee's report, an agreed statement of facts and the entire record in the cause. It is admitted that there are eighteen other claimants in like plight with Jno. Rugheimer presenting claims for unremitted collections—and that his and their claims aggregate $1,123.48. It is also admitted that when the receiver took charge of the bank there was only $5 in cash on hand, but that the nominal assets (loans, discounts, overdrafts and amounts due by other banks) exceeded $100,000, and the indebtedness also exceeded that sum."

The appeal is based upon a single exception, which imputes error to the Circuit Judge in holding that he, Jno. Rugheimer, did not have priority over the creditors of the bank—in that he, Jno. Rugheimer, was not a creditor as to $256 of his claim, but a *cestui que trust,* and error in not specifically holding that he, Jno. Rugheimer, was a *cestui que trust,* and was not a creditor of the bank, as to $256 of his claim (proceeds of three drafts sent to the bank for collection, and collected but not remitted); and error in not holding that he, Jno. Rugheimer, had a lien upon all the assets of the bank, which had been augmented by the collection of three drafts for him, aggregating $256, for which the bank had not remitted." There being no controversy as to any part of the claim presented by the appellant except that portion represented by the three drafts, aggregating the sum of $256, we shall confine our attention to that only. The facts as to these drafts are not as fully and clearly stated in the "Case" (all of which we have copied above) as we would have preferred to have them. For example, it does not ap-

pear how these drafts were indorsed, when they reached the
Commercial and Farmers' Bank, whether they were simply
indorsed in blank or specially "for collection"—which
seems to have been regarded as an important, if not a con-
trolling, circumstance in *Sweeny* v. *Easter,* 1 Wall., 166—
one of the cases cited by counsel for appellant. It is true,
that in the "Case" it is stated that these drafts were sent to
said bank for collection and remittance; but whether that
was intended as a statement that the bank was so notified
either by indorsement or otherwise, or merely a statement of
appellant's intention in sending the drafts, is left to conjec-
ture, or at least to inference; and as it appears in the "Case"
that the drafts were not sent to the Commercial and Farm-
ers' Bank directly by the appellant, but that they were sent
through another bank—the Exchange Banking and Trust
Co.—the inference would be that the appellant did not so
notify the Commercial and Farmers' Bank. Again, it does
not appear *when* these drafts were received or *when* they
were collected; all that does appear is that they were col-
lected before the appointment of a receiver, but how long
before, is left to conjecture. Again, it does not appear that
these drafts, or rather the proceeds thereof, either in the
original form in which they were collected "in money or its
equivalent" or in property into which the same had been
converted, constitute any part of the assets of the bank
which went into the hands of the receiver, out of which the
appellant claims the right to priority of payment. It is true,
that the "Case" does contain the following language: "The
claimant contended that as to the $256 which went to aug-
ment the assets of the bank, he was not a creditor simply, but
had a lien upon all the assets of the bank, giving to him pri-
ority over other claimants who were creditors simply." But
that language does not necessarily imply an admission of the
fact that the proceeds of these drafts went to augment the
assets of the bank which went into the hands of the receiver.
On the contrary, it seems to imply a mere assertion of appel-
lant on which he based his claim to priority. It is very cer-

tain that the proceeds of these drafts did not go into the hands of the receiver in the form of money, for it is expressly admitted in the "Case" that when the receiver took possession of the assets of the bank, there was only $5 in cash on hand, and there is nothing to show that such proceeds went into the hands of the receiver in some other form into which they had been converted. For all that appears, these proceeds may have been lost or otherwise disposed of before any receiver was appointed; and if so, there was nothing in the hands of the receiver upon which any trust could attach—even conceding that there was a trust relation between appellant and the bank as to the proceeds of these drafts. These views are, we think, not only founded in reason, but are supported by authority. In 2 Story Eq. Jurisprudence, sec. 1258-9, it is said: "The general proposition which is maintained both at law and in equity upon this subject is, that if any property, in its original state and form, is covered with a trust in favor of the principal, no change of that state and form can divest it of such trust, or give the agent or trustee converting it, or those who represent him in right (not being *bona fide* purchaser for a valuable consideration without notice), any more valid claim in respect to it than they respectively had before such change * * * It matters not in the slightest degree into whatever form, different from the original, the change may have been made * * * for the product of a substitute for the original thing still follows the nature of the thing itself, so long as it can be ascertained to be such. The right ceases only when the means of ascertainment fail;" and the learned author adds these words: "which, of course, is the case, when the subject matter is turned into money and mixed and confounded in a general mass of property of the same description." But the proposition expressed in these additional words, which is based upon the old doctrine held by some of the earlier cases in England as well as in this country, that money having no ear-mark cannot be followed, has been practically repudiated in the more modern cases—the doc-

trine now held being that, in following a trust fund, it is not necessary to trace the identical coins or bills of which it is composed. Substantial identity is all that need be proved; and, therefore, a *cestui que trust* may pursue and recover a trust fund, originally received by the trustee in the form of money, so long as its identity *as a fund* can be ascertained, although he may be unable to trace the identical coins or bank bills in which such money was originally paid to the trustee. As an illustration of this, it is said, in some of the cases, that if a trustee receives a sum of money, impressed with a trust, and puts such money into a bag along with other money which belongs to the trustee in his own right, the *cestui que trust* has a right to take out of that bag the amount of the trust fund which the trustee had put in the bag; and this for the reason that so much of the money in the bag belongs to the *cestui que trust* and not to the trustee; and the fact that in taking out the money he may get some of the coins or bills which belonged to the trustee in his own right, cannot affect the question, as he gets no more than what belongs to him. Indeed, the fundamental principle upon which the doctrine that a *cestui que trust* may follow property in which his trust funds have been invested into the hands of any person, except a *bona fide* purchaser for valuable consideration, rests, is, that such property in equity belongs to him, and he has a right to reclaim it. Other authorities in support of the view which we have taken, may be found in a note to the case of *Union National Bank of Chicago* v. *Goetz,* 32 Am. St. Rep., at page 125, *et seq.,* where the learned editor has collected a large number of cases in support of the principles he there lays down, one of which he states as follows: "While the *cestui que trust* may follow a trust fund through any number of transmutations, and into the hands of any person except a *bona fide* purchaser for a valuable consideration without notice, so long as he can clearly identify it (meaning, as is shown in another part of the note, *substantial* identification), it is well settled

that his right to so pursue it fails when the means of ascertaining its identify fails."

It is true, that counsel for appellant has cited cases from other States, which are not binding upon us, and which go much further than we are disposed to go.   These cases seem to hold that where a trustee mixes trust funds with his own, all of his assets become impressed with the trust except so much thereof as the trustee may be able to distinguish as his own.   But even that doctrine, as we understand it, would not avail the appellant in this case.   For in this case it has not been made to appear that the so-called trust fund, or any part thereof, has been mixed with the assets which went into the hands of the receiver, out of which appellant is claiming priority of payment.   To entitle him to such priority he must show that his so-called trust fund, in some form, has gone into the assets of the bank now in the hands of the receiver; and this he has failed to do, so far as appears from the facts before us.   He must, therefore, share, ratably, with the other creditors in the distribution of the assets of this insolvent bank, now in the hands of the receiver.

The judgment of this Court is, that the judgment of the Circuit Court is affirmed.